STATE OF NEBRASKA, APPELLEE, v.
DAVID C. PHELPS, APPELLANT.
727 N.W.2d 224

Filed February 2, 2007.  No. S-06-226.

Jeanne A. Burke and James E. Reisinger, of Iowa/Nebraska Innocence Project, for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

WRIGHT, CONNOLLY, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

David C. Phelps was convicted and sentenced to life imprisonment for the 1987 kidnapping of Jill Cutshall. In accordance with the DNA Testing Act, Neb. Rev. Stat. §§ 29-4116 through 29-4125 (Cum. Supp. 2006), Phelps seeks DNA testing of certain items of Cutshall's clothing found by a hunter in a wooded area 3 months after her disappearance. Phelps claims the clothing may contain biological evidence with DNA from a male individual other than himself and would therefore be exculpatory and material to his case. He appeals the district court's denial of his motion for DNA testing and his request for court-appointed counsel.

## SCOPE OF REVIEW

A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Dean*, 270

Neb. 972, 708 N.W.2d 640 (2006). In an appeal from a proceeding under the DNA Testing Act, the trial court's findings of fact will be upheld unless such findings are clearly erroneous. *State v. Poe*, 271 Neb. 858, 717 N.W.2d 463 (2006). Decisions regarding appointment of counsel under the DNA Testing Act are reviewed for an abuse of discretion. *Id.*

## FACTS

Cutshall disappeared on August 13, 1987; she has never been found. The morning of Cutshall's disappearance, her father and stepmother left for work around 6 o'clock. Cutshall was wearing a nightshirt at that time, but her stepmother noted that Cutshall had laid out a purple shirt and a pair of jeans.

Cutshall, who was 9 years old, was to walk 4½ blocks to her babysitter's apartment at 8 a.m. When the stepmother finished work at 3 p.m., she discovered that Cutshall had not arrived at the babysitter's apartment that day. An intensive search by various law enforcement agencies and other persons ensued.

In November 1987, a hunter discovered in a wildlife refuge what were later identified as Cutshall's blouse, jeans, underwear, shoes, and keys. Laboratory testing performed prior to trial by the Federal Bureau of Investigation (FBI) determined that there was no blood or semen on the clothing.

An officer present during a police interview on April 22, 1988, testified that during the interview, Phelps recalled six prior incidents of sexual contact with young girls dating back to 1980. When asked specifically about Cutshall, Phelps stated that he liked her blue eyes, the way she could control people, and how she helped others, but he claimed she was "too old" for him.

Lawrence Pennybacker, a former roommate of Phelps, testified that he and Phelps had watched a movie on television about a child who had been kidnapped and killed, and whose body was never recovered. During the movie, Phelps stated that he wondered what it would be like to kidnap, rape, and kill a child and be able to get away with it. Pennybacker told Phelps that a person had to be sick to think of things like that, and Phelps responded, "[W]hat was wrong with it[?]"

Phelps gave a videotaped interview to a television reporter on January 4, 1989. During this interview, Phelps admitted his

involvement in a sexual assault on Cutshall. After the interview, Phelps accompanied officers to the police station. There, he received and waived his *Miranda* rights. Phelps then largely confirmed the version of events he described during the videotaped interview. Later, he recanted his statements, telling one of the police officers that he had fabricated the entire story out of fear.

In March 1991, a jury convicted Phelps of kidnapping Cutshall, and he was sentenced to life imprisonment. The conviction was affirmed by this court in *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992).

On July 20, 2005, Phelps sought an order authorizing forensic DNA testing of certain items of evidence, including seven postcards sent to various authorities about the kidnapping and clothing purported to have been worn by Cutshall when she was kidnapped. He alleged that current methods of DNA testing were not available at the time of his trial and that new methods of testing could show the presence of DNA from a person other than Phelps, which would be exculpatory evidence relevant to his claim of innocence. He alleged that he was indigent and requested the appointment of an attorney to represent him.

Phelps participated by telephone in a hearing held in the district court for Madison County. Evidence received at the hearing included the bill of exceptions from Phelps' trial; Phelps' affidavit; the affidavit of Steve Hecker, the lead investigator on Cutshall's kidnapping; the affidavit of Rita Olberding, the court reporter at Phelps' trial; the affidavit of Dr. Kerry Bernal, director of the human DNA identity laboratory at the University of Nebraska Medical Center; and the affidavit of Dr. James Wisecarver, director of the clinical laboratory at the University of Nebraska Medical Center.

Hecker described how Cutshall's clothing was recovered from the wildlife refuge and handled after recovery. He indicated that numerous persons touched the clothing, including police investigators, FBI personnel, Phelps' trial counsel, and the jury. Bernal stated that if an item of evidence had been handled by multiple persons, DNA testing would most likely yield mixed DNA profiles or the profile of the last person who contacted the item. Bernal also indicated that various conditions affect the amount and quality of DNA available for testing, including the environmental conditions

to which a piece of evidence was exposed before recovery, the passage of time, and storage conditions. Bernal stated that the identification of a person's DNA on an item indicates contact by that person at some point in time but that the absence of a person's DNA is inconclusive proof regarding whether that person touched the item. Wisecarver described currently used DNA testing systems that provide numerous advantages over earlier systems.

Phelps' affidavit alleged that DNA testing would allow the court to determine the following facts in support of his claim that he was wrongfully convicted:

1. The testing of postcards held by the Madison Police Department will establish that the saliva used to attach stamps to them did not come from me.

2. The testing of clothing alleged to belong to Jill Cutshall and used in evidence against me will establish either that the clothes did not belong to the victim or that my DNA is not present on them.

3. The testing of clothing alleged to belong to Jill Cutshall and used in evidence against me may also establish the presence of DNA belonging to a person other than myself.

The court determined that Phelps had satisfied the threshold requirements of § 29-4120(1) for obtaining DNA testing. It concluded, however, that the statute's further conditions for DNA testing had not been met because the handling of the clothing since its recovery made it unlikely that the original physical composition of the clothing had been safeguarded for purposes of DNA testing and because the evidence did not demonstrate that DNA testing would produce noncumulative, exculpatory evidence relevant to Phelps' claim that he was wrongfully convicted. The court denied Phelps' motion for DNA testing and appointment of counsel and dismissed the action.

## ASSIGNMENTS OF ERROR

Phelps asserts that the court abused its discretion in denying his request for DNA testing and appointment of counsel under the DNA Testing Act. He further asserts that the court erred in determining that the biological evidence lacked compositional integrity for purposes of DNA testing and that DNA testing would not produce noncumulative, exculpatory evidence.

## ANALYSIS

Phelps has voluntarily waived his request for DNA testing of any items except Cutshall's clothing. He has abandoned earlier arguments that DNA testing of biological material will establish either that his DNA is not present or that the recovered items did not belong to Cutshall. Phelps now claims that DNA testing of Cutshall's clothing might produce the DNA profile of a person who has an existing DNA profile in a convicted offender index and who, therefore, may have committed the crime.

## DNA TESTING

A person in custody takes the first step toward obtaining possible relief under the DNA Testing Act by filing a motion requesting forensic DNA testing of biological material. See § 29-4120(1). Forensic DNA testing is available for any biological material that (1) is related to the investigation or prosecution that resulted in the judgment, (2) is in the actual or constructive possession of the State or others likely to safeguard the integrity of the biological material, and (3) either was not previously subjected to DNA testing or can be retested with more accurate current techniques. See *id*. After a motion seeking forensic DNA testing has been filed, the State is required to file an inventory of all evidence that was secured by the State or a political subdivision in connection with the case. See § 29-4120(4).

If the threshold requirements of § 29-4120(1) have been met, then a court is required to order testing only upon a further determination that

> such testing was effectively not available at the time of trial, that the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition, and that such testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced.

§ 29-4120(5). See *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004).

In an appeal from a proceeding under the DNA Testing Act, the trial court's findings of fact will be upheld unless such findings are clearly erroneous. *State v. Poe*, 271 Neb. 858, 717 N.W.2d 463 (2006). The court found that FBI laboratory testing was performed on Cutshall's clothing before trial, which testing

determined that there was no blood or semen on the clothing. Thus, for purposes of DNA·testing of biological material, the court made a factual finding that there was no biological material in the form of blood or semen—biological material that could be the subject of DNA testing.

On appeal, Phelps speculates that a DNA sample on Cutshall's clothing might be similar to a DNA profile of an individual whose DNA is contained in a convicted offender index. Phelps has produced no evidence that such a sample exists on the clothing, and he makes no claim that such a sample exists. He asserts that because DNA testing is now more precise, such a sample may be found. The existence of such a sample is an essential premise of Phelps' claim that he has been wrongfully convicted. However, the record does not support a finding that any such sample of DNA existed on the clothing belonging to Cutshall.

Based on the affidavits and the trial record admitted into evidence, the court determined it was unlikely that the original physical composition of Cutshall's clothing had been safeguarded for purposes of DNA testing. The court found that any DNA testing of the clothing indicating the absence of Phelps' DNA or the presence of someone else's DNA would be inconclusive and thus would not be exculpatory. The clothing was not discovered for nearly 3 months after Cutshall disappeared. It was recovered from a wildlife refuge, in a location where the clothing would have been exposed to weather elements and animals.·The clothing was then handled by numerous persons during the investigation and at trial. Thus, it was not clearly erroneous for the court to determine that the clothing had not been safeguarded for purposes of DNA testing and that DNA testing would not produce noncumulative, exculpatory evidence.

The dispositive question is whether the court abused its discretion in denying the request for DNA testing of Cutshall's clothing. Having determined that the lower court did not err in finding that DNA testing would not produce noncumulative, exculpatory evidence, we conclude that the court did not abuse its discretion in refusing to order DNA testing.

## Appointment of Counsel

Phelps·also assigns as error the court's denial of his request for appointment of counsel. Upon a showing by a person that

DNA testing may be relevant to the person's claim of wrongful conviction, the court will appoint counsel for an indigent person. See § 29-4122. Because Phelps did not show that DNA testing may be relevant to his claim of wrongful conviction, the court did not abuse its discretion in denying his request for appointment of counsel.

## CONCLUSION

We conclude that Phelps' assignments of error are without merit, and we affirm the judgment of the district court.

AFFIRMED.

HEAVICAN, C.J., and GERRARD, J., not participating.